Thomas Dimitre, Attorney at Law L.L.C.
OSB # 103721
dimitre@mind.net
PO Box 801
Ashland, OR 97520
Telephone: 541-890-5022
Attorney for Plaintiff

# UNITED STATES DISTRICT COURT

## OREGON DISTRICT

## PORTLAND DIVISION

**JAMIE SUMMERS, an individual**

    **Plaintiff**

      **v.**

**DEPARTMENT OF THE INTERIOR,
NATIONAL PARK SERVICE,
MIKE STONE, an individual, NICK
RYAN, an individual, MATT SCHAEFER,
an individual, RAY MOORE, an
individual, and KIRSTEN HARDEN,
individuals**

    **Defendants**

_____

Case No. 3:18-cv-01910

**COMPLAINT FOR VIOLATION OF
TITLE VII, U.S.C. SECTION 1981,
Violation of 659A.030, ORS 659a.199,
Intentional Infliction of Emotional
Distress, Intentional Interference with
Economic Relations, Defamation, Breach
of Contract, and Punitive Damages**

**AMOUNT:  $2,000,000**

**JURY TRIAL DEMANDED**

    Plaintiff, JAMIE SUMMERS, hereby brings this suit, demands a jury trial, and alleges as follows:

## JURISDICTION, PARTIES AND VENUE

1.     Jamie Summers, (hereafter "Plaintiff") brings this suit in U.S. District Court, as there are multiple federal questions involved, including 42 USC 20003(e)-2, 42 USC 2000(3)-3 and U.S.C. 42, Chapter 21, Section 1981. In addition, Plaintiff is employed by the U.S. Government, National Park Service, Department of Interior.  This court had pendant jurisdiction over state claims under 28 U.S.C. Section 1367.

2.     Plaintiff was at all times relevant herein, an employee of the National Park Service, United States Department of the Interior. Plaintiff's nationality, ethnicity and race are Native American Indian, and he is a member of the Coquille tribe.

3.     Defendant National Park Service, United States Department of the Interior's (DOI) Oregon headquarters is located in Portland, Oregon, Multnomah County. Accordingly, venue is proper pursuant to 28 U.S.C. Sec. 1391(b)(2).

4.  Defendant, National Park Service (NPS), Crater Lake National Park (CLNP) is located at Crater Lake, Oregon.

5. Defendants Mike Stone and Nick Ryan were, at all pertinent times, employees of the NPS and DOI.

6.  Defendants Matt Schafer, Ray Moore, and Kirsten Harden were, at all pertinent times, supervisors, managers or in other supervisory/management positions, and employees of the NPS and DOI.

7.  All of the acts about which Plaintiff complains occurred in Crater Lake, Oregon, which is located in the Oregon District of the United States District Court.

## FACTS

8.    Plaintiff began working for Defendants (NPS and DOI), at Crater Lake National Park, Oregon, in October 2012 and continues to be employed by Defendants.

9.    Plaintiff's has worked his entire career at Crater Lake National Park as an Engineering Equipment Operator.

10.    Plaintiff's duties include operating equipment, snow removal, and road maintenance.

11.    All of Plaintiff's performance evaluations have been above satisfactory.

12.    Beginning in 2013 and continuing to present, Plaintiff began being subjected to verbally harassing comments from Mike Stone, and later from Nick Ryan, related to his national origin, ethnicity, and race.

13.    Mr. Stone and Mr. Ryan were so rampant in the harassment of Plaintiff, the creation of a hostile work environment, discrimination and retaliation that Plaintiff feared for his personal safety.  Mr. Stone is well known for a nasty attitude and hostile behavior. Plaintiff always ensures that he has an exit when he is in the vicinity of Mr. Stone and Mr. Ryan.

14.    Beginning in 2013 and continuing to present, comments from Mr. Stone and Nick Ryan to or about Plaintiff included, but were not limited to (and were heard on multiple occasions):

    a.  "wagon burner".

    b.  "no, you're getting in a fucking hurry";

    c.  "tell that stinking Indian down there to take a shower while he's in the creek, while he's down there";

    d.  "that fucking Indian shouldn't have been up there";

    e.  "that fat lazy fucking Indian just goes around and breaks shit";

    f.  you're a "fucking liar" (on multiple occasions);

g. "you're just a lying fucking Indian";

h. "you're just making my job harder by lying";

i. "you're just lazy";

j. "you're a dumb Indian";

k. that (Plaintiff) should be fired because he was just a "lying, fucking Indian";

l. "that fucking Indian did that on purpose";

m. (referring to Native Americans and water rights) "those fucking dumb Indians down there, need to change. They were paid back in the day, they fucked all of the money off, and now we have to buy it again";

n. "I have some of those fucking Indian cousins and I won't talk to them";

o. "they (Native Americans) are fucking stupid";

p. "I'm going to get rid of that fucking Brandon (also Native American). I'm going to push as hard as I can to send him back to the Redwoods, and those guys (including Plaintiff) are fucking liars";

q. "those fucking guys (Native Americans Brandon and Plaintiff) are just trying to cover their asses";

r. "I hate that guy (Plaintiff), I ain't talking to him";

s. "this is fucking bullshit", "I'm getting a lawyer, shit is starting to get real around here";

t. "I'm talking to the real equipment operators, not you (to plaintiff)";

15. Mr. Stone has also been overhead making comments such as "an Obama (meaning nigger) in a woodpile."

16. Mr. Stone has also been overhead making sexually harassing remarks to women at CLNP.

17.  The harassment and retaliation based on Plaintiff's race/ethnicity/national origin and creation of a hostile working environment because of Plaintiff's race/ethnicity/national origin, discrimination and retaliation by the Defendants, and the lack of any agency response to end the harassment and hostile work environment based on his race/ethnicity/national origin, discrimination and retaliation, has made it extremely difficult for Plaintiff to go to work, and has led to major health problems for Plaintiff. For example, Plaintiff's blood pressure and pulse exceed safe limits while he is at work due to the ethnicity/race/national origin based harassment/hostile work environment, only to get better when he is off of work.  Plaintiff's health has suffered due to the continuing/ongoing harassment and hostile work environment based on his race/ethnicity/national origin.

18.  The harassment and retaliation based on Plaintiff's race/ethnicity/national origin and creation of a hostile work environment because of Plaintiff's race/ethnicity/national origin, along with discrimination and retaliation by Defendants and the lack of any agency response to end the harassment/hostile work environment has caused Plaintiff to be so stressed and so negatively impacted his mental and physical health  that he could not come to work on numerous occasions.

19.  Plaintiff's physician has told Plaintiff that his health issues are directly related to the work related harassment/hostile work environment based on his race/ethnicity/national origin, and the discrimination and retaliation against him.

20.  Beginning in 2013 and continuing to present, Plaintiff notified the following numerous work leads, supervisors and managers about the racial/ethnic/national origin harassment/hostile workplace, discrimination and retaliation, in part:

     **a.  Matt Schafer/Roads Supervisor.**  Plaintiff notified Mr. Schafer three times in 2014 that a hostile work environment was being created, that he was being harassed and retaliated

against, due to his race/ethnicity/national origin and also discriminated and retaliated against. He told Mr. Schafer that Mr. Stone had called him a "fucking lying Indian" and that Mr. Stone has stated on numerous occasions that in the real world Plaintiff "would be fired". On each occasion, Mr. Schafer's response to Plaintiff was to "put your big boy pants on and deal with it."  Mr. Schafer told Plaintiff how he had jumped a worker in a similar situation, and advised Plaintiff to do the same. Mr. Schafer did not initiate an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies [1], or assist Plaintiff in any way.

**b. Ray Moore/Chief of Maintenance.**  Plaintiff spoke with Mr. Moore on at least four different occasions – on December 5, 2014, December 15, 2014, January 5, 2015 and February 18, 2015, complaining about hostile work environment/harassment based on his ethnicity, race and national origin, along with discrimination and retaliation. Plaintiff advised Mr. Moore that Mr. Stone had called him a "wagonburner", "lazy fucking stupid Indian", and "dumb Indian". Plaintiff told Mr. Moore that he had already spoken with Mr. Schafer and Mr. Thomas to no

---

[1] On December 28, 2011, the Department of Interior and National Park Service's Order 16F -
    Section IV. (B)
    1) handle allegations of harassing conduct, utilizing established procedures within 24 hours of learning of any allegations of harassment,
    (2) Reporting (pursuant to procedures in Section V of this Order) any incident of harassing conduct that they witness or that is otherwise brought to their attention;
    (3) Acting daily to prevent harassment in the workplace and retaliation against those who engage in prohibitive activity;
    (4) In consultation with the servicing Equal Employment Opportunity Manager and  Human Resources Manager, providing interim relief to alleged victims of harassment pending the outcome of the inquiry to ensure that further misconduct does not occur without burdening the alleged victims and that any relief resolves all pending claims; all relief actions provided shall be reduced to a written agreement and shall incorporate any and all pending claims and forwarded to the EEOC as soon as appropriate; and
    (5) Taking prompt and appropriate corrective and/or appropriate disciplinary action in accordance with the Department of the Interior Table of Penalties, up to and including removal or termination, against employees who engage in harassing conduct or who have not carried out their responsibilities under this Director's Order."
    Order 16F was the current policy through 2017 and was superseded in 2017 and 2018 by new policies.

avail. Mr. Moore's response to Plaintiff was "well maybe you're just too sensitive." Mr. Moore did not initiate an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies, nor did he assist Plaintiff in any way.

**c. Chris Bradley/Roads Supervisor.** Plaintiff spoke with Mr. Bradley on at last five occasions. Plaintiff notified Mr. Bradley that Mr. Stone, Mr. Ryan and others were hostile towards him due to his national origin/race/ethnicity. Plaintiff told Mr. Bradley that Mr. Stone and Mr. Ryan, and others, were harassing him, retaliating against him, and creating a hostile work environment due to his race, ethnicity and national origin, and that they were discriminatory and retaliatory towards him. Plaintiff told Mr. Bradley about the "fucking lying Indian" comment that Mr. Stone had made to him, and also told Mr. Bradley that Mr. Stone has made racist comments about Plaintiff to other employees. Plaintiff told Mr. Bradley that he had notified Mr. Thomas, Mr. Moore and Mr. Schafer, with no results. Ms. Bradley did not initiate an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies, or assist Plaintiff in any way. However, when Mr. Bradley left his position at Crater Lake National Park, he told Plaintiff "watch your back with that backstabber Mike (Stone), he's out to get you."

**d. Phil Sauvey/Acting Roads Foreman.** Plaintiff notified Mr. Sauvey on two or more occasions regarding Mr. Stone's racial/national origin, ethnicity harassment/hostile work environment and retaliation against Plaintiff, and that he was also being discriminated and retaliated against by Mr. Stone, Mr. Ryan and others. Plaintiff told Mr. Sauvey that he had already gone to Mr. Thomas, Mr. Bradley, Mr. Schafer and Mr. Moore, to no avail. Mr. Sauvey told Plaintiff to wait until a new roads supervisor was hired. Mr. Sauvey did not initiate an

investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies, and did nothing to assist Plaintiff.

**e. (1) Bill Friesen/Roads Supervisor.** Plaintiff went to Mr. Friesen on at least ten occasions in late 2016 and 2017 and notified him that he was being harassed and retaliated against based on his race/national origin/ethnicity, and discriminated against and retaliated against, by Mr. Stone, Mr. Ryan and others, and that Stone and Ryan were creating a hostile work environment. Plaintiff told Mr. Friesen that he had already gone to Mr. Thomas, Mr. Bradley, Mr. Schafer, Mr. Moore and Mr. Sauvey and that none of them initiated an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies, or assisted him in any way. Mr. Friesen told Plaintiff that he couldn't do anything, that "the crew needs to stick together and grow some balls and go above the Park". Mr. Friesen did not initiate an investigation, as required, and did nothing to assist the Plaintiff.

e. (2) Mr. Friesen has admitted that he was informed in January 2017 of an allegation of a hostile work environment due to harassment. No investigation was initiated as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies. Mr. Friesen also admitted that other employees had made allegations of inappropriate comments and behavior made by Mr. Stone and Mr. Ryan. Mr. Friesen also had heard from other crew members who told him that they were eye witnesses to harassment against Plaintiff. No investigation was ever initiated as to any of these complaints. Mr. Friesen also confirmed that he made the "grow some balls" comment.

**f. (1) Kirsten Harden/Chief of Maintenance**. Plaintiff notified Ms. Harden of the racial/national origin/ethnic harassment/retaliation and hostile work environment, along with discrimination and retaliation being perpetuated on him by Mr. Stone, Mr. Ryan, and others, at

least ten times from 2017 to present, and the lack of an agency response. He told her that he had spoken with Mr. Thomas, Mr. Bradley, Mr. Schafer and Mr. Moore, Mr. Sauvey and Mr. Frisen, with nothing being done. He told her that as a result of the stress from the constant racial/national origin harassment, his health was in decline. On February 25, 2017, Ms. Harden told Plaintiff to "just ignore Mr. Stone, and that maybe he would quit". She told Plaintiff that she would understand if he needed to take time off, and that Mr. Stone was a narcissist and a bully. Ms. Harden did not initiate an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies, nor did she assist Plaintiff in any way.

f. (2) Ms. Harden has admitted that she has heard about anti-Native American comments on at least three occasions, and that she never initiated an investigation as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies. She knew about the "dirty Indian" comment from 2016 and did not initiate an investigation as required. Ms. Harden also admitted that the lead, Steve Thomas, *came to her home on Christmas Eve 2017* to report that another Native American, Brandon Alberta had been called a "wagon burner" by Mr. Stone. Ms. Harden did not initiate an investigation, as required. Ms. Harden acknowledged a third report to her of harassment/hostile work environment from 2017 regarding the Klamath Tribe calling their water right. Mr. Harden also did not initiate an investigation, as required.

g. (1) Steve Thomas/Work Lead. From 2013 to present, Plaintiff has notified Mr. Thomas on dozens of occasions, of the ongoing, continual race/national origin/ethnic based harassment, along with retaliation and discrimination from Mr. Stone, Mr. Ryan, and others, and the lack of any agency response. Plaintiff told Mr. Thomas that he had gone to Mr. Bradley, Mr. Schafer and Mr. Moore, Mr. Sauvey, Mr. Frisen, Mr. Thomas, and Ms. Harden to no avail. Mr. Thomas admitted that he had witnessed racial harassing comments from Mr. Stone regarding

Plaintiff, including "tell that dirty stinking Indian to take a shower". Mr. Thomas admitted that he had witnessed racial comments from Mr. Stone directed at Plaintiff, regarding Plaintiff's race/national origin/ethnicity on numerous occasions.

g. (2) (a) Mr. Thomas admitted that Plaintiff has made complaints about harassing treatment coming from Mike Stone back to at least the summer of 2013. Mr. Thomas told Roads Supervisor Matt Shaefer about the complaints. Mr. Shaefer's response appeared to be to tell Plaintiff and everyone on the crew to deal with (their) problems in a person-to-person manner, that is, if someone is harassing you, stand up to them and tell them that it is unacceptable. Mr. Thomas states that Mr. Shaefer is often quoted by the road crew as telling Plaintiff to "put your big boy shorts on and stand up to Mike" (Mr. Stone). This advice, as well as Mr. Shaefer's failure to initiate an investigation into these complaints violates DOI and NPS rules, including the National Park Service's Anti Harassment Policy – Order 16F and other policies Mr. Thomas reported numerous incidents to his supervisors. No investigation was initiated by Mr. Thomas' superiors in response to any of the reported incidents.

(b) Mr. Thomas reported the comment that Mr. Stone made regarding Plaintiff – "good, tell that dirty Indian to use it to take a shower" – to Matt Shaefer. No investigation was initiated as required.

(c) Mr. Thomas also communicated Plaintiff's and the crew's complaints to Ray Moore. Mr. Moore "seemed to choose not to act," according to Mr. Thomas. Mr. Thomas noticed that Mr. Bradley, Roads Supervisor, saw first hand what Plaintiff was dealing with, but he didn't seem to act. Mr. Thomas also complained to Phil Sauvey, Acting Facility Manager, to no avail. Mr. Thomas also witnessed Plaintiff complaining to Mr. Sauvey, to no avail.

(d) Mr. Thomas made Bill Friesen aware of the harassment/hostile work environment that Plaintiff was experiencing. Mr. Thomas believed that Mr. Friesen saw the harassment occurring, but he did not act. Mr. Friesen told Ms. Harden and the Region about the harassment, but no investigation was completed.

(e) Mr. Thomas witnessed Mr. Stone making racist comments about Plaintiff.

` (f) Mr. Thomas also has personal knowledge that most of the crew in the last five years has been present when inappropriate comments were made by Mr. Stone and Mr. Ryan about or to Plaintiff. The inappropriate comments were reported and it appeared nothing was done.

(g) Plaintiff reported his concerns about the harassment and hostile work environment created by Mr. Stone and Mr. Ryan, to Mr. Thomas on dozens of occasions. The reporting and complaining included almost weekly and sometimes daily conversations and interactions, over the course of 5 + years. Whether it was Plaintiff, Mr. Thomas, or other members of the crew conveying the complaints to management, little was done to stop the harassment, according to Mr. Thomas.

(h) Mr. Thomas also stated that Mr. Stone was counseled by Mr. Shaefer regarding the "tell the dirty stinking Indian to take a shower" comment in 2013 and told that "if anything like that happened again he would be gone." Though Mr. Stone has continued to harass Plaintiff and create a hostile work environment for him due to Plaintiff's race, ethnicity and national origin, he is still employed at CLNP.

(i) Mr. Thomas often took actions to try to move Plaintiff's and other's complaints up the chain of command but was unsuccessful. Plaintiff also tried to take his complaints up the chain of command, but was unsuccessful. Mr. Thomas believed that Mr. Stone's harassment was based on Plaintiff's race and nationality.

**h. (1)  Roger Van Curler, Retired WG-10 Equipment Operator.** Plaintiff complained to Mr. Van Curler about the racial, ethnic and national origin harassment and the hostile work environment, along with discrimination and retaliation that existed and that he had been suffering through due to Mr. Stone and Mr. Ryan, and others, and the lack of an agency response on multiple occasions.

h. (2) (a) Plaintiff told Mr. Van Curler how uncomfortable and shocked he was with not only the hostilities by Mr. Stone, but also the lack of an appropriate response from his immediate supervisors. Mr. Van Curler witnessed Mr. Stone belittle Plaintiff about operating equipment or his appearance. Mr. Van Curler believes that Plaintiff's race played a part in Mr. Stone's disrespect.

(b) Mr. Van Curler, after witnessing several inappropriate comments about Plaintiff and others directed at young women in the office, by Mr. Stone, complained to Mr. Shaefer about it twice.  Mr. Van Curler came away from the two conversations with Mr. Shaefer feeling that he hadn't accomplished anything.

(c) In 2016, Mr. Van Curler overheard Mr. Stone make the comment "yeah an Obama (nigger) in the woodpile."

(d) Mr. Van Curler has stated: "I can't say why the supervisors didn't react more forcible to the inappropriate behavior emanating out of the mechanic's shop (Mike Stone and Nick Ryan)."

(e) Mr. Van Curler stated the following:  "There were so many failures during whole affair. After 12 years of working for the NPS I can say without hesitation that it needs a service wide retraining in harassment and hostile work environments. It needs sop's in place to be

followed in these circumstances and it needs to impress upon its supervisors a career ending consequence if these rules are ignored.

(f) Mr. Van Curler also stated that Mr. Stone has an explosive, violent temper. Van Curler stated that Mr. Stone does not tolerate being told anything and has zero tolerance for the most constructive of criticisms.  Anything that goes against his way of thinking makes him instantly mad.  One time it was so violent that for the first time in an over forty year working career he was afraid for his safety, due to Mr. Stone.

**i.  Paul Triantafilos/Crater Lake National Park Human Resources**.  Plaintiff contacted Mr. Triantafilos, on at least four occasions beginning in September 2017 through November 2017.  Plaintiff notified Mr. Triantafilos, that he was being harassed by Mr. Stone and Nick Ryan, and others, due to his race/national origin/ethnicity and that had created a hostile working environment.  Plaintiff told Mr. Triantafilos that he had already complained to Mr. Bradley, Mr. Schafer, Mr. Moore, Mr. Sauvey, Mr. Frisen, Ms. Harden, and Mr. Thomas to no avail. Plaintiff told Mr. Triantafilos that he was "having a nervous breakdown" and asked him what to do. Plaintiff broke down and began crying.  Plaintiff told Mr. Triantafilos that he shouldn't have to quit due to the hostile work environment crated by Mr. Stone. Mr. Triantafilos gave Plaintiff information about early retirement.  Plaintiff asked about a hardship or lateral transfer, either within or outside of CLNP, so that he could get away from the situation. Mr. Tranianfilos told Plaintiff that those options were not available. Mr. Triantafilos did not initiate an investigation, as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies and did not assist Plaintiff in any way.

**j.  Scott Deyo/DOI/NPS Ombudsman.**  Plaintiff called Mr. Deyo on two separate occasions on October 19, 2017 and November 29, 2017 and left messages. His messages stated

that he was being harassed and that a hostile work environment had been created by Nick Ryan and Mike Stone and others, and that he had been discriminated and retaliated against. His messages were never returned. Mr. Deyo did not initiate an investigation as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies and did not assist Plaintiff in any way.

k.   Between 2014 to present, Plaintiff also complained to other, acting supervisors on multiple occasions, talked to employees at other Parks, and called another National Park Service employee, Billie Miller, about the harassment and hostile work environment, discrimination and retaliation.  No response or assistance was provided.

21.  In all, Plaintiff notified/complained to his supervisors approximately sixty times regarding harassment and hostile working environment, along with discrimination and retaliation. On no occasion, did any of his supervisors assist him in any way as required by the National Park Service's Anti Harassment Policy – Order 16F and other policies. On no occasion did any of his supervisors or managers initiate an investigation, as required. At no time, did any of his supervisors, managers, or leads follow the DOI/NPS' anti harassment and anti hostile work environment policies, as required.

22.  Many CLNP employees are concerned regarding Mr. Stone and his temper and potential violent behavior, so they avoid him, and if they must meet with him, ensure that they have an escape plan.

23.  Plaintiff begged and pleaded with his supervisors and managers to help end the constant, daily, untenable hostile work environment, harassment, discrimination and retaliation, all based on ethnicity, race and national origin. He cried, he told them that he may have to quit in order to save his health, all to no avail and with no response.

24. Both Mike Stone and Nick Ryan frequently told Plaintiff that they were trying to get him terminated from his employment. On numerous occasions both Stone and Ryan either made up stories, lied to the employer about alleged wrongdoing of Plaintiff, or inflated actual incidents, in order to try and get Plaintiff terminated from employment, due to his ethnicity, race and national origin.

25. On numerous occasions Plaintiff has notified Mike Stone and Nick Ryan to cease harassing him, and to cease creating a hostile work environment, to no avail. Instead, as a result of these discussions, Mr. Stone and Mr. Ryan grew ever more hostile towards Plaintiff.

26. Despite Plaintiff's numerous, multiple attempts to stop the harassment, hostile work environment, discrimination and retaliation, the NPS/DOI only initiated an investigation after Plaintiff's counsel wrote to the NPS/DOI complaining about the harassment/hostile work environment, discrimination and retaliation and demanded an investigation, and after Plaintiff filed a written complaint in 2018.

27. In or about September 2018 Acting Roads Supervisor Becraft stated the following to Plaintiff: "I just want to let you know they know they made a mistake (regarding doing nothing about the harassment and hostile work environment based on Plaintiff's race, ethnicity and national origin), they know they messed up, and they want to start doing things right." Plaintiff then stated "They do know that they made a mistake?" Mr. Becraft said "Oh yeah, they know, and they want to start doing it right."

28. Plaintiff has followed the National Park Service Anti Harassment Policy, Order 16F (and other NPS and DOI policies) when reporting harassment and hostile work environment, when he promptly reported harassing and hostile work environment conduct per IV. (A.) (3) and V. (A.)

(1) and (2) and V. (B.) of Order 16F. Plaintiff also followed NPS and DOI policies when he

reported discrimination and retaliation against him.

29. Order 16F requires the following of NPS managers:

> a. **IV. (B) (1).** Handling allegations of harassing conduct, utilizing established procedures (as described I section VU of this Order) **within 24 hour**s of learning of any allegations of harassment.  (emphasis original).
>
> b. **VI. Management Response to Harassment Reports**
> A supervisor or manager who receives an allegation, or otherwise becomes aware of intimidating, hostile and/or offensive conduct involving subordinates in his/her chain of command must immediately:
> A. Determine, within 24-72 hours and in consultation with the EEO Manager/Human Resources Manager, technical guidance;
> B. Determine, within 24 -72 hours, who may be involved and whether any interim action is required to insulate the alleged victim from further intimidating, hostile, or offensive conduct while the inquiry is being conducted;
> C. Work with the EEO Manager and Human Resources Manager and CADR to initiate actions within 24-72 hours to conduct a prompt, thorough, and impartial inquiry;
> D. Once the inquiry has been conducted, the results of the inquiry will be shared with the Human Resources Manager. The EEO Manager will make recommendations concerning appropriate corrective actions, e.g., training, display of training posters. The Human Resources Manager will make recommendations as to appropriate disciplinary actions; and
> E. If misconduct is found, ensure that actions are taken to stop the harassing conduct immediately as well as actions to prevent further harassment.

30. DOI/NPS supervisors and managers failed to follow Order 16F, and other policies,

following Plaintiff's complaints about the hostile work environment/harassment based on his

race, ethnicity and national origin.

31. Plaintiff filed a written complaint with the National Park Service, Department of the Interior

on March 12, 2018.

32. Though, for the first time, the NPS/DOI initiated an investigation, it was not completed

within the statutory 180 day deadline.

33. On March 28, 2018, after learning that the harassment/hostile work environment continued,

Plaintiff's counsel sent a cease and desist letter to Mr. Dennisten and Jen Gifford at CLNP.

34. On April 29, 2018, Plaintiff's counsel sent a Litigation Hold letter to the NPS, DOI and CLNP.

35. On or about September 15, 2018, Plaintiff received a right to sue letter from the EEOC.

36. Plaintiff also filed a Federal Tort Claim Notice on January 23, 2018 and August 24, 2018. The January 2018 tort claim was denied on February 7, 2018. The August 2018 claim was neither accepted or denied.

37. In 2017, Plaintiff was told by Trails Supervisor Jen Gifford that CLNP was initiating a formal investigation into a minor incident at the Park, that would not have otherwise been investigated, because "you have filed an EEOC complaint."

38. Currently, Plaintiff is an Engineering Equipment Technician, permanent full time, subject to a mandatory two week furlough each year. CLNP has had lateral positions open as an Engineering Equipment Technician permanent full time, not subject to furlough (NSTF). In the past, the NSTF position has been filled by seniority. Though Plaintiff has been the most senior in this classification, and the NSTF position has been open, CLNP management has refused to laterally promote Plaintiff. Plaintiff has therefore, lost two weeks of pay per year since at least 2015.

39. In September 2018 Acting Roads Supervisor Andrew Becraft had a conversation with Plaintiff regarding the NSTF position. Plaintiff asked Mr. Becraft for the lateral transfer to the NSTF position. Mr. Becraft told Plaintiff "Why would they hire you into that permanent position when they know that you want to leave (due to the ongoing harassment and work environment)?" Plaintiff's only reason for wanting to leave is due to the ongoing, persistent harassment and hostile work environment, due to his national origin, ethnicity and race.

40. During September 2018, Andrew Becraft, Acting Roads Supervisor told Plaintiff the

following: "No one wants to work with you. People are tired of your complaining (about harassment and hostile work environment)."

41.  The Department of Interior and National Park Service each have fifteen or more employees.

42.  In 2004, the United States Equal Employment Opportunity Commission (EEOC) published a report entitled "Model EEO Programs Must Have an Effective Anti-Harassment Progra"m (Report).  The Report found, in part, that governmental agencies lacked anti-harassment policies and that when policies were in place, they did not address non-sexual harassment, and that policies had an unclear or insufficient investigation procedures.

43.  The DOI and NPS have had anti harassment and anti hostile work environment policies in place, as well as anti discrimination and anti retaliations policies in place since at least 2011.

44.  Order 16F: National Park Service Anti Harassment Policy" dated December 28, 2011 states the following, in part:

> **III. Anti-harassment Policy**
> Harassment will not be tolerated by the National Park Service, regardless of whether the conduct violates the laws prohibiting discriminatory harassment, when:
>
> " . . . C. The conduct can unreasonably interfere with an individual's work performance or create an intimidating, hostile or offensive work environment.
>
> Harassment can occur in a variety of circumstances, including but not limited to the following:
> A. The harasser can be an individual's supervisor, a supervisor in another area, an agent of the employer, a co-worker or a non-employee.
> B. The person who alleges harassment does not have to be the person directly subjected to the harassment, but can be anyone affected by the offensive conduct.
> C. Unlawful harassment may occur without economic injury to, or the discharge of, the person who alleges the harassment. Offensive conduct may include, but is not limited to offensive jokes, slurs, epithets or name calling; physical assaults or threats; intimidation; ridicule or mockery; insults or putdowns; offensive objects or pictures that interfere with job performance.
>
> *Employees are encouraged to inform the alleged harasser directly that the conduct is unwelcome and that it must stop. If the employee is uncomfortable in confronting the*

*alleged harasser, he/she should immediately discuss their concerns with the immediate supervisor, second line supervisor, or third line supervisor (when appropriate), Human Resources Manager, the Equal Employment Opportunity Program Manager, or a representative of their choice.* To the extent possible, the Service will assure confidentiality of the individual who brings claims of harassment forward. Anti-harassment laws also prohibit harassment against individuals in retaliation for— filing a complaint of discrimination; testifying, or participating in any way in an investigation, proceeding, or lawsuit under these laws; or opposing employment practices that they reasonably believe discriminate against individuals, or are in violation of these laws.

**IV. Responsibilities**
**A. Each employee of the Service is responsible fo**r:
(1) Refraining from any and all harassing conduct;
(2) Complying with all policy requirements which are disseminated by the Servicewide Equal Employment Opportunity Manager and cooperating with any inquiry under this Director's Order; and
(3) Promptly reporting, pursuant to the procedures in Section V of this Order, any incident of harassing conduct that he/she experiences before it becomes a pattern of misconduct so pervasive and offensive as to constitute a hostile work environment. The Service cannot correct harassing behavior if the conduct is not known.

**B. Each Manager and Supervisor is responsible for:**

*(1) Handling allegations of harassing conduct, utilizing established procedures (as described in Section VI of this Order)* **within 24 hours** *of learning of any allegations of harassment;*
*(2) Reporting (pursuant to procedures in Section V of this Order) any incident of harassing conduct that they witness or that is otherwise brought to their attention;*
*(3) Acting daily to prevent harassment in the workplace and retaliation against those who engage in prohibitive activity;*
(4) In consultation with the servicing Equal Employment Opportunity Manager and Human Resources Manager, providing interim relief to alleged victims of harassment pending the outcome of the inquiry to ensure that further misconduct does not occur without burdening the alleged victims and that any relief resolves all pending claims; all relief actions provided shall be reduced to a written agreement and shall incorporate any and all pending claims and forwarded to the EEOC as soon as appropriate; and
(5) Taking prompt and appropriate corrective and/or appropriate disciplinary action in accordance with the Department of the Interior Table of Penalties, up to and including removal or termination, against employees who engage in harassing conduct or who have not carried out their responsibilities under this Director's Order."

*. . . VI. Management Response to Harassment Reports*
*A supervisor or manager who receives an allegation, or otherwise becomes aware of intimidating, hostile and/or offensive conduct involving subordinates in his/her chain of command must immediately:*

*A. Determine, within 24-72 hours and in consultation with the EEO Manager/Human Resources Manager, technical guidance;*
*B. Determine, within 24 -72 hours, who may be involved and whether any interim action is required to insulate the alleged victim from further intimidating, hostile, or offensive conduct while the inquiry is being conducted;*
*C. Work with the EEO Manager and Human Resources Manager and CADR to initiate actions within 24-72 hours to conduct a prompt, thorough, and impartial inquiry;*
*D. Once the inquiry has been conducted, the results of the inquiry will be shared with the Human Resources Manager. The EEO Manager will make recommendations concerning appropriate corrective actions, e.g., training, display of training posters. The Human Resources Manager will make recommendations as to appropriate disciplinary actions; and*
*E. If misconduct is found, ensure that actions are taken to stop the harassing conduct immediately as well as actions to prevent further harassment."*

45. On April 13, 2017, the Secretary of the Department of the Interior, Mr. Zinke, published an anti harassment memo addressed to "All Department of the Interior Employees", that stated the following, in part:

"As Secretary of the Department of the Interior (DOI), I am committed to ensuring a workplace free from harassment. *I expect each DOI employee to cultivate a work environment of dignity and respect that a reasonable person would not find to be hostile, intimidating, or offensive.* It is our individual and collective responsibility to ensure that our interactions with each other, contractors who support our mission, and the public are free of harassment, discrimination, or retaliation.

*All DOI employees, especially leaders, managers, and supervisors, shall enforce this policy through committed leadership and shall not condone or ignore harassment of which they have knowledge. Reported incidents of harassment will be thoroughly investigated and dealt with promptly, fairly, and effectively.*

If the alleged harassment is substantiated, immediate and appropriate action will be taken. When appropriate, any employee who is found to have committed sexual harassment, discriminatory behavior, or any other harassing or retaliatory activities will be subject to disciplinary and/or adverse action."

46. On October 12, 2017, Michael T. Reynolds, Acting Director of the National Park Service, issued the following "Director's Order #16E:

"The National Park Service (NPS) is committed to a workplace free of discrimination and harassment based on race, color, religion, sex (including pregnancy and gender identity),

sexual orientation, national origin, age (40 years of age and over), disability, family medical history (including genetic information), status as a parent, marital status, political affiliation, and/or reprisal. *The NPS will not tolerate offensive sexual or non-sexual harassing behavior against any NPS employee, intern, volunteer, contractor or other nonfederal employee, visitor, or other member of the public. The NPS also will not tolerate adverse treatment of employees because they report harassment or provide information related to such complaints.*"

47. In 2017, a National Park Service survey found that 38% of NPS employees had been harassed or discriminated against.

48. Also, in 2017, a Department of the Interior survey found that 35% of DOI employees reported harassment of some kind.

49. In December 2017, DOI Secretary, Ryan Zinke, stated: "All employees have the right to work in a safe and harassment free environment."

50. On April 19, 2018, P. Daniel Smith, Deputy Director of the National Park Service issued "Director's Order #16E – National Park Service Anti Harassment Policy which states, in part:

"**1.     Background and Purpose**
The National Park Service (NPS) is committed to providing a work environment free from (1) discrimination and harassment based on race, color, religion, sex (including pregnancy and gender identity), sexual orientation, national origin, age, disability, family medical history (including genetic information), status as a parent, marital status, political affiliation; and (2) illegal retaliation. The NPS will not tolerate offensive sexual or non-sexual harassing behavior against any NPS employee, intern, volunteer, contractor or other nonfederal employee, visitor, or other member of the public. The NPS also will not tolerate adverse treatment of employees because they report harassment or provide information related to such complaints.
The purpose of this Order is to ensure that the NPS takes immediate and appropriate corrective action, including appropriate disciplinary action, to eliminate harassing conduct regardless of whether the conduct rises to the level of a violation of law. Therefore, the goal of this Order is to address harassing conduct at the earliest possible stage, before it becomes "severe or pervasive," that is harassment within the meaning of anti-discrimination law.


**3. Policy**

3.1     Prohibited Harassing Conduct

The conduct prohibited by this Order includes, but is broader than, the legal definitions of harassment and sexual harassment. Harassing conduct prohibited by this Order is defined as unwelcome conduct, verbal or physical, including intimidation, ridicule, insult, comments, or physical conduct, that is based on an individual's protected status or protected activities, when:

a) the behavior can reasonably be considered to adversely affect the work environment; or

b) an employment decision affecting the employee is based upon the employee's acceptance or rejection of such conduct.

Protected status is defined as an individual's race, color, religion, sex (including pregnancy and gender identity), sexual orientation, national origin, age, disability, family medical history (including genetic information), status as a parent, marital status, or political affiliation. (See section 3.2, Prohibited Retaliation, for the definition of protected activities).

Although not every instance of inappropriate behavior may meet the legal definition of harassment, such behavior undermines morale and the NPS mission. Accordingly, the misconduct prohibited by this Order is broader than the definition of illegal harassment under title VII of the Civil Rights Act to ensure appropriate officials are notified of, and can promptly correct, harassing conduct. Harassment becomes illegal when enduring the offensive conduct becomes a condition of continued employment or the conduct is sufficiently severe or pervasive as to create a work environment that a reasonable person would consider intimidating, hostile, or abusive. All harassing conduct, as defined above, is a violation of this Order."

3.4    Management Duty to Act

*Supervisors and managers who observe or are informed of allegations of harassing conduct must follow the procedures in RM-16E to:*

*a) report the conduct or allegations to the appropriate officials, even if the employee raising the allegation requests confidentiality (see section 5, Maintaining Confidentiality);*

*b) ensure that a prompt, objective, and thorough investigation is conducted; and*

*c) take steps to ensure the harassing conduct is appropriately addressed to deter further misconduct, including taking appropriate disciplinary action.*

*The fact that a potential victim of harassing conduct will or has filed an EEO complaint or grievance alleging harassment does not relieve a manager of his or her duty to act as required by this Order. Therefore, it is possible that* multiple inquiries into a given complaint will proceed in parallel.

Appropriate corrective action, disciplinary or otherwise, up to and including removal, will be taken against any supervisor or other management official who fails to perform her or his obligations as set forth in this Order and RM-16E, including any failure to report known violations of this policy."

51. On April 23, 2018, the United States Department of the Interior's Personnel Bulletin 18-01, "Prevention and Elimination of Harassing Conduct' took effect. This Bulletin stated the following, in part:

"**5. Policy.**

The Department is committed to providing a work environment free of discrimination and harassment based on race, color, religion, sex (including pregnancy and gender identity), sexual orientation, national origin, age, disability, genetic information (including family medical history), status as a parent, marital status, or political affiliation, and free from illegal retaliation. The Department will not tolerate offensive sexual or non-sexual harassing behavior against any Department employee, intern, volunteer, contractor or other non-Federal employee, visitor, or other member of the public. The Department also will not tolerate adverse treatment of employees because they report harassing conduct or provide information related to such complaints. The purpose of this policy is to ensure that the Department takes immediate and appropriate corrective action, including appropriate disciplinary action, to eliminate harassing conduct regardless of whether the conduct rises to the level of a violation of law. Therefore, the goal of this policy is to address harassing conduct at the earliest possible stage, before it becomes "severe or pervasive," i.e., harassment within the meaning of anti-discrimination law.

**A. Prohibited Harassing Conduct.** The conduct prohibited by this policy includes, but is broader than, the legal definitions of harassment and sexual harassment. Harassing conduct prohibited by this policy is defined as unwelcome conduct, verbal or physical, including intimidation, ridicule, insult, comments, or physical conduct, that is based on an individual's protected status or protected activities under this policy, when:
1. the behavior can reasonably be considered to adversely affect the work environment; or
2. an employment decision affecting the employee is based upon the employee's acceptance or rejection of such conduct.
Protected status is defined as an individual's race, color, religion, sex (including pregnancy and gender identity), sexual orientation, national origin, age, disability, family medical history (including genetic information), status as a parent, marital status, or political affiliation. Protected activities under this policy are defined in Section 5.B.

***D. Management Duty to Act.*** *Supervisors/managers who observe or are informed of allegations of harassing conduct must comply with the following requirements:*
*a. report the conduct/allegations to the appropriate officials, even if the employee raising the allegation requests confidentiality (see Section 8.A. for additional details);*
*b. ensure that a prompt, objective, and thorough investigation is conducted; and*
*c. take steps to ensure that the harassing conduct is appropriately addressed to deter further misconduct, including taking disciplinary action, if appropriate.*

*The fact that a potential victim of harassing conduct will or has filed an EEO complaint or grievance alleging harassment **does not** relieve a supervisor/manager of his or her duty to act pursuant to this policy. Therefore, it is possible that multiple inquiries into a given complaint may proceed in parallel.*

Appropriate corrective action, disciplinary or otherwise, up to and including removal, will be taken against any supervisor or other management official who fails to perform her or his obligations as set forth in this policy, including any failure to report known violations of this policy."

**FIRST CLAIM**
**VIOLATION OF TITLE VII**
**Section 2000e-2 (a) (Section 703)**
**(Unlawful Employment Practice due to race, color and national origin)**
**(All Defendants)**

52.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 51, above.

53.  Section 2000e-2 (a)(Section 703) of Title VII states the following:

"(a) Employer practices

It shall be an unlawful employment practice for an employer -

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or national origin."

54.  Defendants violated Section 2000e-2 (a)(Section 703) of Title VII.

55.  Defendants discriminated against Plaintiff with respect to compensation, terms, conditions, and privileges or employment due to Plaintiff's race, color and national origin.

56.  As a result of Defendants' violations, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment,

humiliation, loss of enjoyment of life, and damage to his physical and mental health and to his personal and professional reputation.

## SECOND CLAIM
### VIOLATION OF TITLE VII
### Section 2000e-2 (m) (Section 703)
### (Impermissible Consideration of Race, Color, National Origin)
### (All Defendants)

57. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 56, above.

58. Section 2000e-2 (m) (Section 703) of Title VII states the following:

> "(m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices.
>
> Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice."

59. Defendants violated Title VII, Section 2000e-2 (m) (Section 703) when they considered Plaintiff's race, color and national origin in their employment practices.

60. As a result of Defendant's violations of the Title VII, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

## THIRD CLAIM
### VIOLATION OF TITLE VII
### Section 2000e-3 (Section 704)
### (Discrimination/Retaliation)
### (All Defendants)

61. Plaintiff realleges and reincorporates by reference herein all of the allegations contained

in paragraphs 1 through 60, above.

62. Section 2000e-3 (Section 704) of Title VII states the following:

> "(a) Discrimination for making charges, testifying, assisting, or participating in enforcement proceedings
>
> It shall be an unlawful employment practice for an employer to discriminate against any of his employees or applicants for employment, for an employment agency, or joint labor-management committee controlling apprenticeship or other training or retraining, including on—the-job training programs, to discriminate against any individual, or for a labor organization to discriminate against any member thereof or applicant for membership, because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

63. Defendants violated Title VII, Section 2000e-3 (Section 704) when they discriminated against Plaintiff due to his race, color and national origin due to his making charges, testifying, assistant, and participating in enforcement proceedings.

64. As a result of Defendant's violations of the Title VII, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**FOURTH CLAIM**
**Violation of TITLE VII**
**(Unlawful Harassment and Hostile Work Environment)**
**(Against all Defendants)**

65. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 64, above.

66. Defendants harassed and allowed harassment of Plaintiff by Defendants' employees in violation of Title VII.

67. Defendants' actions were unwelcome to and known to be unwelcome by Plaintiff.

68. Defendants' action were subjectively and objectively offensive to Plaintiff.

69. Defendants' actions towards Plaintiff were severe and pervasive.

70. As a result of Defendant's violations of the Title VII, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**FIFTH CLAIM**
**VIOLATION OF U.S.C. 42, CHAPTER 21, SECTION 1981**
**AS AMENDED BY THE CIVIL RIGHTS ACT OF 1991**
**(Violation of Equal Rights)**
**(Against all Defendants)**

71. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 70, above.

72. U.S.C. 42, Chapter 21, Section 1981 states the following:

"(a) Statement of equal rights

All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind. . ."

73. Plaintiff's equal rights were violated regarding the enforcement of contracts and the other provisions of Section 1981, due to Plaintiff's race and ethnicity.

74.  As a result of Defendant's violations of section 1981, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**SIXTH CLAIM**
**Violation of ORS 659A.030(a)**
**(Discrimination based on race, color, national origin)**
**(National Park Service, Department of the Interior)**

75.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 74, above.

76.  ORS 659A.030 (1) (a) states the following:

"(1) It is an unlawful employment practice:

(a) For an employer, because of an individual's race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older, or because of the race, color, religion, sex, sexual orientation, national origin, marital status or age of any other person with whom the individual associates, or because of an individual's juvenile record that has been expunged pursuant to ORS 419A.260 (Expunction) and 419A.262 (Expunction proceeding), to refuse to hire or employ the individual or to bar or discharge the individual from employment."

77.  Defendants violated ORS 659A.030(a) when it discriminated against Plaintiff due to his race, color and national origin.

78.  As a result of Defendant's violations of ORS 659A.030(a), Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, mental and physical health and to his personal and professional reputation.

**SEVENTH CLAIM**
**Violation of ORS 659A.030 (1) (b)**
**(Discrimination and harassment in compensation,**
**or terms, conditions or privileges of employment)**
**(National Park Service, Department of the Interior)**

79.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 78, above.

80.  ORS 659A.030 (1) (b) states the following:

"(1)  (1) It is an unlawful employment practice:

(b) For an employer, because of an individual's race, color, religion, sex, sexual orientation, national origin, marital status or age if the individual is 18 years of age or older, or because of the race, color, religion, sex, sexual orientation, national origin, marital status or age of any other person with whom the individual associates, or because of an individual's juvenile record that has been expunged pursuant to ORS 419A.260 (Expunction) and 419A.262 (Expunction proceeding), to discriminate against the individual in compensation or in terms, conditions or privileges of employment."

81.  Defendants discriminated against and harassed Plaintiff in compensation and terms, conditions, and privileges of employment due to his race, color and national origin.

82.  As a result of Defendant's violations of the ORS 659a.030 (1)(b), Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**EIGHTH CLAIM**
**Violation of ORS 659A.030 (1) (f)**
**(Discrimination due to Opposing Illegal Practice)**
**(National Park Service and Department of the Interior)**

83.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 82, above.

84. ORS 659.030 (1) (f) states the following:

(1) "It is an unlawful employment practice:

(f) For any person to discharge, expel or otherwise discriminate against any other person because that other person has opposed any unlawful practice, or because that other person has filed a complaint, testified or assisted in any proceeding under this chapter or has attempted to do so."

85. Defendants violated ORS 659.030 (1)(f) by discriminating against Plaintiff because he opposed an unlawful practice, because he filed a complaint, and because he testified and assisted in any proceeding under this chapter.

86. As a result of Defendant's violations of the ORS 659a.030 (1)(f), Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**NINTH CLAIM**
**Violation of ORS 659A.030 (1) (g)**
**(Aiding and Abetting Discrimination, Retaliation and Harassment)**
**(Mike Stone, Nick Ryan, Matt Schafer,**
**Ray Moore, and Kirsten Harden)**

87. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 86, above.

88. ORS 659A.030 (1) (g) states the following:

"(1) It is an unlawful employment practice:

(g) For any person, whether an employer or an employee, to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter or to attempt to do so."

89. Defendants Mike Stone, Nick Ryan, Matt Schafer, Ray Moore, and Kirsten Harden violated ORS 659A.030 (1) (g) when they aided, abetted and coerced the doing of acts forbidden under ORS 659A.

90.  As a result of Defendants, Mike Stone, Nick Ryan, Matt Schafer, Ray Moore, and Kirsten Harden's, violations of the ORS 659a.030 (1)(g), Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

### TENTH CLAIM
### Violation of ORS 659A.199
### (Discrimination and Retaliation due to Whistleblowing)
### (National Park Service and Department of the Interior)

91.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 90, above.

92.  ORS 659A.199 states the following:

> "**Prohibited conduct by employer.** (1) It is an unlawful employment practice for an employer to discharge, demote, suspend or in any manner discriminate or retaliate against an employee with regard to promotion, compensation or other terms, conditions or privileges of employment for the reason that the employee has in good faith reported information that the employee believes is evidence of a violation of a state or federal law, rule or regulation."

93.  Defendants violated ORS 659A.199 when they discriminated and retaliated against Plaintiff in regards to promotions, compensation and other terms, conditions or privileges of employment because Plaintiff, in good faith, reported violations of state and federal law, rule and regulations, due to the harassment, discrimination and retaliation that were occurring based on his race, ethnicity, and national origin.

94.  As a result of Defendant's violations of the ORS 659a.199, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress,

harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

### ELEVENTH CLAIM
### Intentional Infliction of Emotional Distress
### (All Defendants)

95.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 94, above.

96.  Defendants intended to inflict severe emotional distress on the Plaintiff.

97.  Defendants' acts were the cause of the Plaintiff's severe emotional distress

98.  The Defendants' acts constituted an extraordinary transgression of the bounds of socially tolerable behavior.

99.  As a result of Defendant's intentional infliction of emotional distress, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

### TWELFTH CLAIM
### Intentional Interference with Economic Relations
### (Mike Stone, Nick Ryan, Matt Schafer,
### Ray Moore, and Kirsten Harden)

100.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 99, above.

101.  Defendants intentionally interfered with Plaintiff's economic relations with his employer.

102. Plaintiff has an existing employment relationship with his employer, Department of the Interior, National Park Service.

103. Defendants Mike Stone, Nick Ryan, Matt Schafer, Ray Moore, and Kirsten Harden intentionally interfered with that relationship;

104. Defendants Mike Stone, Nick Ryan, Matt Schafer, Ray Moore, and Kirsten Harden are third parties.

105. The interference was accomplished for an improper purpose or through improper means.

106. A casual effect existed between the interference and damage to the economic relations.

107. Plaintiff suffered damages.

108. As a result of Defendants' intentional interference with economic relations, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical  health and to his personal and professional reputation.


### THIRTEENTH CLAIM
### Defamation
### (Mike Stone, Nick Ryan)

109. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 108, above.

110. Defendants Mike Stone and Nick Ryan defamed Plaintiff when they published multiple defamatory statements regarding Plaintiff to third parties, as stated above.


111. Defendants Stone and Ryan knew that the statements that they made regarding Plaintiff were false.

112. Defendants published the comments to multiple third parties at Crater Lake National Park, knowing that they were false.

113. As a result of Defendant's defamation, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage tto his mental and physical health and to his personal and professional reputation.

**FOURTEENTH CLAIM**
**Breach of Contract**
**(National Park Service, Department of the Interior)**

114. Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 113, above.

115. Contracts existed between Plaintiff and Defendant employer.

116. Contracts included, but were not limited to:

a. Order 16F: National Park Service Anti Harassment Policy" dated December 28, 2011, (Exhibit 1);

b. Secretary of the Department of the Interior, Mr. Zinke's anti harassment memo dated April 12, 2017, (Exhibit 2);

c. Michael T. Reynolds, Acting Director of the National Park Service's order entitled: "Director's Order #16E, dated October 12, 2017 (Exhibit 3);

d. DOI Secretary, Ryan Zinke's, statement, as follows: "All employees have the right to work in a safe and harassment free environment", stated in December 2017.

e. P. Daniel Smith, Deputy Director of the National Park Service's "Director's Order #16E – National Park Service Anti Harassment Policy, dated April 19, 2018 (Exhibit 4).

116. Plaintiff and Defendant employer were aware of the contracts.

117. Defendant employer violated the contracts.

118.  As a result of Defendant's breach of contract, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment, humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**FIFTEENTH CLAIM**
**Punitive Damages**
**(All Defendants)**

119.  Plaintiff realleges and reincorporates by reference herein all of the allegations contained in paragraphs 1 through 118, above.

120.  Defendants were malicious, oppressive, and in reckless disregard of the Plaintiff's rights.

121.  Defendant's actions were due to ill will, or spite, and for the purpose of injuring the Plaintiff.

122.  Defendants had complete indifference to the Plaintiff's safety or rights.

123.  Defendants actions were oppressive and they injured and damaged or otherwise violated the rights of the Plaintiff with unnecessary harshness or severity, by the misuse or abuse of authority or power or by the taking advantage of some weakness or disability or misfortune of the Plaintiff.

124.  Defendants acted with malice and have shown a reckless and outrageous indifference to a highly unreasonable risk of harm and have acted with a conscious indifference to the health, safety, and welfare of Plaintiff.

125. As a result of Defendants' actions, Plaintiff has, and will continue to suffer damages, including, but not limited to, lost income and benefits, emotional distress, harassment,

humiliation, loss of enjoyment of life, and damage to his mental and physical health and to his personal and professional reputation.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff, Jamie Summers, prays for judgment against defendants, severally and individually, granting the following relief:

1.     Compensatory damages, including but not limited to, lost wages and benefits, loss of peace of mind and enjoyment of life, damage to his mental and physical health and reputation, emotional distress, and other specific and general damages in an amount proven at trial;

2. Exemplary and punitive damages in an amount to be proven at trial as allowed by Title VII, Section 1981, ORS 31.730, and ORS 659A.885;

3. Attorney's fees and costs as allowed by 42 U.S.C. Section 2000e-5 (k), and ORS 659A.885 (7)(a);

4. Prejudgment and post judgment interest;

5. Civil penalties and fines as determined by statute;

6.  Injunctive relief as authorized by 659A.885 (1), and Title VII, Section 2000e (g) (1) and Section 1981 that enjoins Defendants from discriminating against, retaliating against, and harassing and creating a hostile work environment to Plaintiff based on his race, ethnicity and national origin.

7. Any other relief to which Plaintiff may be entitled upon proof at trial that the Court deems just and proper.

Dated:  November 1, 2018                    THOMAS DIMITRE ATTORNEY AT LAW LLC
                                            /s/ Thomas Dimitre
                                    By: _____
                                            Thomas Dimitre
                                            Attorney for Plaintiff
                                            Jamie Summers